# United States of America



## ...RTMENT OF THE ARMY

| Washington, DC | May 8, 2019 |
|---|---|
| PLACE | DATE |

I HEREBY CERTIFY that the a... ...ute true and accurate copies of files pertaining to Joshua A. Berry, a retired member of the United States A... ...records from the Army Review Boards Agency (ARBA) and Army Board for Correction of Military Record... ...e located in Arlington, Virginia. A copy of the ARBA records and copies of other documents are in the official ... ...ody of the Military Personnel Litigation Branch, Litigation Division, Office of the Judge Advocate General of t...

EDWARD BAHDI
Lieutenant Colonel, U.S. Army
Chief, Military Personnel Litigation Branch

...lemental Administrative Record, Pages 000199-000221

I HEREBY CER... ...ntenant Colonel Edward Bahdi, who signed the foregoing certificate, is the Chief, Military Personnel Litig... ...itigation Division, Office of the Judge Advocate General of the Army, and that full faith and credit should b... ...ertification.



IN TESTIMONY WHEREOF I, __Kathleen S. Miller__

The Administrative Assistant to the Secretary of the Army, have hereunto caused the seal of the Department of the Army to be affixed this __8th__ day of

__May__ , __2019__

By ____

*Administrative Assistant,*

**MICHAEL D. MIERAU, Jr.**
**Colonel, U.S. Army**
**Chief, Litigation Division**

DA F... ...1998          EDITION OF 1 MAR 66 IS OBSOLETE          APD PE v1.10

## *SUPPLEMENTAL ADMINISTRATIVE RECORD INDEX*
## *JOSHUA A. BERRY*

| TAB | DOCUMENT | DATE | PAGE |
|-----|----------|------|------|
| 12. | Letter from Deputy Assistant Secretary, Army Review Boards Agency to United States District Court for the District of Columbia, reference: AR20180011836, SSG Joshua Berry | December 19, 2018 | 000199-000201 |
| 13. | United States District Court for the District of Columbia, Memorandum Opinion, Case No. 17-cv-2112, Howard M. Berry v. Mark Esper, Secretary of the Army, et al. | October 28, 2016 | 000202-000207 |
| 14. | Excerpts from Army Regulation (AR) 600-8-22, Military Awards, para. 2-8 | June 25, 2015 | 000208-000215 |
| 15. | All Navy (ALNAV) Message 079/11, Subject: Department of the Navy Standards for Award of the Purple Heart | December 9, 2011 | 000216-000221 |



**DEPARTMENT OF THE ARMY**
ARMY REVIEW BOARDS AGENCY
251 18TH STREET SOUTH, SUITE 301
ARLINGTON, VA 22202-3531

REPLY TO
ATTENTION OF

DEC 1 9 2018

AR20180011836 SSG Joshua Berry

United States District Court
  for the District of Columbia
510 4th Street, NW, Third Floor
Washington, DC 20001

For the Honorable Court:

In accordance with an order from the U.S. District Court for the District of
Columbia, dated August 22, 2018, I hereby provide for the Court an explanation of my
October 26, 2016 decision regarding Mr. Howard Berry's application to the Army Board
for Correction of Military Records (ABCMR) to have the Army award the Purple Heart to
his son, Staff Sergeant (SSG) Joshua Berry.

The reason I denied the application, which I explain more fully below, is that the
criteria for the Purple Heart award do not match the circumstances of SSG Berry's
injury.

The Purple Heart was established by George Washington during the
Revolutionary War and is bestowed upon members of the United States Armed Forces
who have been wounded as a result of enemy action against the United States. In
general terms, each approved award of the Purple Heart must meet each of the
following criteria: (1) the wound must result from enemy or hostile action, international
terrorist attack, or friendly fire; (2) the wound must have required treatment by a medical
officer; and (3) the records of medical treatment must have been made part of the
wounded Soldier's medical record.[1]

A review of SSG Berry's records indicates he injured his shoulder during the
November 5, 2009 terrorist attack at Fort Hood, Texas. The injury required medical
treatment and SSG Berry's treatment records were made part of his official Army
records. Consequently, two of the three criteria (terrorist incident and medical treatment
documentation) appear to have been met.

The key issue in SSG Berry's case, however, is whether the injury itself qualifies
as a "wound" for purposes of the Purple Heart award. The Army's Military Awards
regulation defines a wound as an injury to any part of the body from an outside force or

---

[1] Army Regulation (AR) 600-8-22, *Military Awards*, paras. 2-8(a) – (e), (June 25, 2015).



Printed on Recycled Paper

**000199**

agent.[2]  When contemplating the merits of a Purple Heart case, the key issue to consider is the degree to which the enemy caused the injury.[3]

The facts in SSG Berry's case indicate that he was injured when he leapt over a desk to take cover and, in doing so, dislocated his shoulder. Consequently, the specific issue presented is whether these particular circumstances indicate an injury resulting from an outside force or agent and whether there is a sufficient degree of enemy (in this case, terrorist) causation relative to the injury.[4] The applicable regulatory framework implies a requirement that the wound result from an affirmative offensive action initiated by an opposing military actor.

As examples for qualifying injuries, the regulation cites injuries caused by "enemy bullet, shrapnel, or other projectile created by enemy action"; caused by "enemy-placed trap or mine"; or caused by "enemy-released chemical, biological or nuclear agent."[5] These examples all contemplate a force or energy initiated by the enemy or, more broadly, someone other than the injured Soldier himself.

Specifically excluded from the regulation's qualifying injury criterion are "frostbite"; "trench foot or immersion foot"; "heat stroke"; "food poisoning not caused by enemy agents"; "chemical, biological, or nuclear agents not released by the enemy"; "battle fatigue"; and "disease not directly caused by enemy agents."[6]  Thus, the regulation excludes injuries not directly caused by the enemy even though the injuries might be severe and might have been sustained in a kinetic combat environment.

When applied to the facts and circumstances of this case, these provisions do not immediately suggest that SSG Berry's injury satisfies the criteria for a qualifying wound.  The force or agent that separated SSG Berry's shoulder was the force he himself exerted in order to leap or dive to the floor to take cover.  Although SSG Berry would not have dived to the floor but for the terrorist's attack, the greater weight of the evidence indicates that SSG Berry's injury resulted from his effort to take cover in reaction to the gunfire he heard emanating from outside the building and outside the office that he and others were occupying. Consequently, with regard to SSG Berry's separated shoulder, it is difficult to conclude that there existed a high degree of enemy causation or that the injury was inflicted by an outside force.

The regulation specifically excludes "self-inflicted wounds" from consideration for the Purple Heart, but it does make an allowance if such wounds are sustained "in the

---

[2] AR 600-8-22, para. 2-8(e).
[3] AR 200-8-22, para. 2-8(f).
[4] See generally, AR 200-8-22, paras. 2-8(e), (f).
[5] AR 200-8-22, para. 2-8(g).
[6] AR 200-8-22, para. 2-8(h).

heat of battle and not involving gross negligence."[7]  Although this provision might appear to cover SSG Berry's injury, the phrase "self-inflicted wound" implies an accidental discharge of one's own weapon. In this regard, a separated shoulder from a tactical dive to the ground could not plausibly be deemed as "self-inflicted" any more than could a broken leg suffered during a tactical leap into a foxhole. Furthermore, at the time he was injured, SSG Berry had not yet entered the heat of battle. Consequently, it is my determination that SSG Berry's injury does not fit within this particular exception.

Based on the foregoing, I find that SSG Berry's injury was not the result of an outside force or agent and that there is an insufficient causal connection between the injury and the terrorist's attack.

Buttressing my overall assessment in this regard is the Navy's policy regarding the categories of injuries that qualify, and do not qualify, as Purple Heart wounds. Like the Army's policy, the Navy policy emphasizes the degree to which the enemy caused the injury. The applicable Navy regulation provides:

> Injuries suffered due to an accident that is neither directly nor indirectly caused by the effects of enemy weapons do not meet the eligibility requirements for the [Purple Heart], even if the accident occurs in a combat zone or during an engagement with the enemy.  Examples of such accidental wounds / injuries that would not qualify for the [Purple Heart] are: … Injuries sustained while seeking shelter, escaping, or evading."[8]

This language seems to specifically exclude injuries sustained under circumstances similar to those in this case. Although not controlling on Army Purple Heart decisions, the Navy regulation indicates that my finding with regard to SSG Berry's case is not inconsistent with how the other armed services assess Purple Heart cases.

In summation, I regretfully must find that a preponderance of evidence in this case does not demonstrate an error or an injustice. I therefore deny the relief requested by Mr. Howard Berry on behalf of his son, SSG Joshua Berry.

*Francine C. Blackmon*
Francine C. Blackmon
Deputy Assistant Secretary of the Army
(Review Boards)

---

[7] AR 200-8-22, para. 2-8(h)(9).
[8] See All Navy (ALNAV) Message 079/11, SUBJECT: Department of the Navy Standards for Award of the Purple Heart, para. 3(d), (December 9, 2011).

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**HOWARD M. BERRY,**

        Plaintiff,

    v.

**MARK ESPER, Secretary of the Army,[1]
*et al.*,**

        Defendants.

Case No. 17-cv-2112 (CRC)

---

## MEMORANDUM OPINION

On November 5, 2009, Nidal Malik Hasan, an Army medical officer, went on a shooting

spree at Fort Hood, a military post in Texas, killing 13 people and injuring 30 others. Former

Army Staff Sergeant Joshua Berry was stationed at Fort Hood that day and, during the attack,

was in a briefing room inside one of its buildings. Hasan at some point fired 30 to 40 rounds just

outside that building. Berry told others in the room to get down on the floor. He then heard

bullets strike the room's exterior metal doors, leapt over a desk to take cover and, in doing so,

dislocated his shoulder.

Joshua's father believes that his son—who died in 2013—should have received a Purple

Heart for his injury. Unlike other military decorations, which are awarded only upon the

recommendation of a commander, the Purple Heart is given to any servicemember who meets

certain regulatory criteria. Army Reg. 600-8-22, ¶ 2.8(*c*). The Army's regulations provide that a

servicemember is entitled to the Purple Heart if he is wounded as the result of a terrorist attack

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Esper has been
automatically substituted for Ryan D. McCarthy, who no longer serves as Secretary.



committed by a foreign terrorist organization. 10 U.S.C. § 1129a; Army Reg. 600-8-22,
¶ 2-8(*b*)(10).

Initially, the Army declined to award the Purple Heart to servicemembers injured or
killed in the Fort Hood attack because, though Hasan admitted that he was inspired by Al-Qaeda
in the Arabian Peninsula and was in contact with one of its senior recruiters, the terrorist group
was not understood to be formally behind the attack. But Congress clarified in a 2015 statute
that servicemembers injured during attacks inspired by foreign terrorist organizations and
committed by individuals who were in communication with such organizations could qualify for
the Purple Heart. 10 U.S.C. § 1129a(b); Army Reg. 600-8-22, ¶ 2-8(*b*)(10)(b). In turn, the
Secretary of the Army determined that servicemembers injured or killed in the Fort Hood attacks
were eligible for the Purple Heart if they met the other regulatory criteria. See Administrative
Record ("A.R.") 78–79.

Shortly after that announcement, the plaintiff applied for his son to receive the award.
The U.S. Army Decorations Board denied his application in March 2015 on the ground that the
attack did not directly cause Berry's injury. A.R. 6. In doing so, it relied on an email from a
Fort Hood staff attorney stating that—while he was not certain—he believed that Hasan had not
shot at the building where Berry was located. Id.

The Decorations Board informed the plaintiff of its decision by letter and explained that
he could apply to the Army Board for Correction of Military Records if he felt the decision was
unjust. He did so. Along with his application for review, he filed witness statements his son had
made to investigators and a statement from another individual indicating that Hasan had indeed
shot at the building inside which Berry had been injured. A.R. 7–9.

2

**000203**

By a 2-to-1 vote, the Corrections Board recommended that Berry receive a Purple Heart. A.R. 10. The Board found it clear that Berry's injury "met the basic medical criteria" for award of the Purple Heart—*i.e.*, that he suffered a qualifying "wound" during the attack. A.R. 9; see Army Reg. 600-8-22, ¶ 2.8(*e*). The real issue, in the Board's view, was "the degree to which the enemy (*i.e.*, the terrorist) caused his injury," A.R. 9—a necessary consideration under the Army regulations, Army Reg. 600-8-22, ¶ 2.8(*f*).

On this point, the Board began by citing the regulations' examples of injuries that would warrant a Purple Heart, including those incurred "while making a parachute landing from an aircraft that had been brought down by enemy fire" or "as a result of a vehicle accident caused by enemy fire." Id. ¶ 2-8(i)(1). The Board observed that Berry's injury was not obviously analogous: the examples "describe[d] circumstances under which the individual would not have control over his or her bod[y]," while Berry was injured as a result of his own decision to leap over the desk for cover. A.R. 9. And yet, the Board explained, Berry would not have made that decision but for the active shooter outside the building. Id. Though it did not expressly reconcile these competing points, the Board was evidently persuaded that the latter prevailed and established causation. It recommended that Berry be granted a Purple Heart. A.R. 10.

But a few months later, the Deputy Assistant Secretary of the Army—exercising the Secretary's authority to override the Correction Board's recommendations—found to the contrary. She registered her disagreement in a single paragraph of a one-page letter:

> I have reviewed the findings, conclusions, and Board member recommendations. I find there is not sufficient evidence to grant relief. Therefore, under the authority of [10 U.S.C. § 1552], I have determined that the facts do not support a conclusion that his injury met the criteria for a Purple Heart.

A.R. 2.

3

000204

Berry's father challenges that denial under the Administrative Procedures Act ("APA"). He claims that the Deputy Assistant Secretary's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and that it was "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). The Court agrees that the decision violates the APA, and it will remand this matter to the Army for reconsideration.

Challenges to agency decisions under the APA are properly resolved on motions for summary judgment—which the parties have both filed here. Unlike with a typical summary judgment motion, however, the relevant question is not whether the record creates a material dispute of fact. Instead, the court's job is to review the decision in light of the record before the agency and to decide whether it complied with the APA.

To be sure, courts are "unusually deferential" toward military decisions regarding servicemembers' records, including those related to decoration. Kreis v. Sec'y of Air Force, 866 F.2d 1508, 1514 (D.C. Cir. 1989). But the summary denial here fails even that generous standard of review. It provides no meaningful analysis—only a boilerplate determination "that the facts do not support a conclusion that [Berry's] injury met the criteria for a Purple Heart." A.R. 2. Why not? Was there conflicting evidence regarding how immediate of a threat Hasan posed to Berry as he sat inside the building? Was the evidence clear but the Deputy Assistant Secretary thought that Berry could have taken cover without injuring himself? Or did she read the regulations as categorically taking the Purple Heart off the table for servicemembers injured while taking cover?

The denial letter provides no hints. In turn, the Court cannot meaningfully evaluate the reasoning behind it. That is enough to warrant remand. The deference accorded to military personnel decisions does not totally shield them from review. See, e.g., Saint-Fleur v. McHugh,

4

**000205**

83 F. Supp. 3d 149, 157 (D.D.C. 2015). Rather, even a military personnel decision "is owed no deference if it fails to 'give a reason that a court can measure . . . against the arbitrary or capricious standard of the APA.'" Coburn v. McHugh, 679 F.3d 924, 929 (D.C. Cir. 2012) (quoting Kreis, 866 F.2d at 1514–15). Decisions that are "utterly unreviewable" must be vacated as arbitrary and capricious. Kreis, 866 F.2d at 1514.

That is the case here. In the face of an eight-page Board recommendation that provided a reasoned basis for awarding a Purple Heart, the Deputy Assistant Secretary summarily disagreed. The Court could not grant deference to that change of course if it tried.

Not to say that summary denials must always be set aside under the APA. If, for example, the Board had written a denial decision and the Deputy Secretary summarily *affirmed* it, the Court could fairly presume (even if not with certainty) that she was adopting the Board's reasoning. In that case, "the agency's path" might "reasonably be discerned." Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 27, 52 (1983). The Court would also be more inclined to uphold the denial if it were obviously supported by the record. It is not. Even if not clearly incorrect, the denial is at least on shaky ground. As the Corrections Board observed, injuries caused by taking cover are not precisely like the examples stated in the Army regulations. But neither are they much like the examples of injuries that do *not* suffice: for instance, those attributable to "[a]ccidents . . . not related to or caused by enemy action" or for "[s]elf inflicted wounds, except when in the heat of battle and not involving gross negligence." Army Reg. 600-8-22, ¶ 2.8(*h*)(8)–(9). The regulations also emphasize that "strict interpretation of the requirement for the wound or injury to be caused by direct result of hostile action" should not "preclude the award being made to deserving personnel." Id. ¶ 2.8(*i*).

5

At a minimum, Berry's case presents a more complicated issue of causation—whether an injury incurred while taking cover from gunfire outside a building was "caused" by the gunfire —than the Deputy Assistant Secretary's summary denial suggests. The government's arguments that this issue was properly resolved against Berry are efforts to rationalize the Army's cursory denial. The APA demands that the Army *itself*—acting through its officers—explain its resolution of the issue. See Pierce v. SEC, 786 F.3d 1027, 1034 (D.C. Cir. 2015) ("A reviewing court may not supply a reasoned basis for an agency action that the agency itself did not give in the record under review.").

The Court is unwilling, however, to go the extra step of *ordering* that Berry be awarded a Purple Heart. Rather, remand is proper. Dickson v. Sec'y of Defense, 68 F.3d 1396, 1407 (D.C. Cir. 1995) ("Where an agency has failed . . . to explain the path it has taken, we have no choice but to remand for a reasoned explanation." (internal quotation omitted)). On remand, the Army, assuming it wishes to stick with its determination, must explain why Berry is not entitled to a Purple Heart and do so with sufficient clarity that "a court can measure" the denial "against the 'arbitrary or capricious' standard of the APA." Kreis, 866 F.2d at 1514–15.

The Court will thus grant the plaintiff's motion for summary judgment and deny the defendants' motion. A separate order accompanies this memorandum opinion.

Christopher R. Cooper
_____
CHRISTOPHER R. COOPER
United States District Judge

Date: August 22, 2018

6

000207

**Army Regulation 600–8–22**

**Personnel-General**

# Military Awards

**Headquarters**
**Department of the Army**
**Washington, DC**
**25 June 2015**

**UNCLASSIFIED**

000208

**Headquarters**
**Department of the Army**
Washington, DC
25 June 2015

**\*Army Regulation**
**600–8–22**

**Effective 25 July 2015**

**Personnel-General**

# Military Awards

By Order of the Secretary of the Army:

RAYMOND T. ODIERNO
*General, United States Army*
*Chief of Staff*

Official:

GERALD B. O'KEEFE
*Administrative Assistant to the*
*Secretary of the Army*

**History.** This publication is an administrative revision. The portions affected by this administrative revision are in the summary of change.

**Summary.** This regulation provides Department of the Army policy, criteria, and administrative instructions concerning individual military decorations, Army Good Conduct Medals, service medals and ribbons, combat and special skill badges and tabs, unit decorations, trophies, and similar devices awarded in recognition of accomplishments. It prescribes the policies and procedures concerning United States Army awards to foreign military personnel and foreign decorations to United States Army personnel.

**Applicability.** This regulation applies to the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. It also applies to retired military personnel of all branches, foreign military personnel, and Department of Defense civilians, as indicated.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff, G–1. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army internal control process.** This regulation contains internal control provisions in accordance with AR 11–2 and identifies key internal controls that must be evaluated (see appendix G).

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from the Deputy Chief of Staff, G–1 through the Commander, U.S. Army Human Resources Command, Awards and Decorations Branch (AHRC–PDP–A), 1600 Spearhead Division Avenue, Fort Knox, KY 40122–5408.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to the Commander, U.S. Army Human Resources Command, Awards and Decorations Branch (AHRC–PDP–A), 1600 Spearhead Division Avenue, Fort Knox, KY 40122–5408 or via electronic mail to usarmy.knox.hrc.mbx.tagd-awards@mail.mil.

**Distribution.** This regulation is available in electronic media only and is intended for command levels A, B, C, D, and E for the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

---

## Contents (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*

*Section 1*
*Overview, page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*

---

\*This regulation supersedes Army Regulation 600–8–22, dated 11 December 2006.

AR 600–8–22 • 25 June 2015

i

**UNCLASSIFIED**

**000209**

## 1–51. The Army Records Information Management System

AR 25–400–2 requires that specific filing be accomplished for awards related documents. See AR 25–400–2 for further details and disposition guidance.

# Chapter 2
# Department of Defense Awards and Decorations

## Section I
## Overview

## 2–1. Objective

*a.* This chapter explains DOD policies and procedures on awarding Defense decorations and service awards; nonmilitary decorations; the acceptance of foreign military decorations by Servicemembers of the Armed Forces of the United States; and the Office of the Secretary of Defense Identification Badge. It describes the various Defense awards; the basis or eligibility requirements for the award; who is eligible to receive the award; and who is authorized to approve the award. It tells how to prepare, submit, and process recommendations for DOD decorations.

*b.* The objective of the DOD Military Awards Program is to ensure Servicemembers of the Armed Forces of the United States receive tangible recognition for acts of valor, exceptional service or achievement, and acts of heroism not involving actual combat. Processing and approval of DOD awards are awarded in the name of the Secretary of Defense.

## 2–2. Order of precedence

DOD awards are categorized as U.S. military decorations, service medals, and service ribbons. The order of precedence for wear of these awards is stated in AR 670–1.

## Section II
## Individual Department of Defense Decorations

## 2–3. Defense Distinguished Service Medal

The Defense DSM was established by EO 11545, 9 July 1970. It is awarded by the Secretary of Defense to officers of the Armed Forces of the United States whose exceptional performance of duty and contributions to national security or defense have been at the highest levels. The prescribing directive for the Defense DSM is DODM 1348.33, Volume 1.

## 2–4. Defense Superior Service Medal

The Defense Superior Service Medal was established by EO 11904, 6 February 1976. It is awarded by the Secretary of Defense to Servicemembers of the Armed Forces of the United States who, after 6 February 1976, rendered superior meritorious service in a position of significant responsibility. The prescribing directive for the Defense Superior Service Medal is DODM 1348.33, Volume 1.

## 2–5. Defense Meritorious Service Medal

The Defense MSM was established by EO 12019, 3 November 1977. It is awarded in the name of the Secretary of Defense to Servicemembers of the Armed Forces of the United States who, after 3 November 1977, distinguished himself or herself by noncombat meritorious achievement or service. The prescribing directive for the Defense MSM is DODM 1348.33, Volume 1.

## 2–6. Joint Service Commendation Medal

The Joint Service Commendation Medal was authorized by the Secretary of Defense on 25 June 1963. It is awarded in the name of the Secretary of Defense to Servicemembers of the Armed Forces of the United States who, after 1 January 1963, distinguished themselves by meritorious achievement or service. The prescribing directive for the Joint Service Commendation Medal is DODM 1348.33, Volume 1.

## 2–7. Joint Service Achievement Medal

The Joint Service Achievement Medal was authorized by the Secretary of Defense on 3 August 1983. It is awarded in the name of the Secretary of Defense to Servicemembers of the Armed Forces of the United States below the grade of COL/O–6 who, after 3 August 1983, distinguished themselves by outstanding performance of duty and meritorious achievement. The prescribing directive for the Joint Service Achievement Medal is DODM 1348.33, Volume 1.

## 2–8. Purple Heart

*a.* The PH was established by General George Washington at Newburgh, NY, on 7 August 1782, during the

000210

Revolutionary War. It was reestablished by the President of the United States per War Department General Orders 3, 1932 and is currently awarded pursuant to EO 11016, 25 April 1962; EO 12464, 23 February 1984; Public Law (PL) 98–525, 19 October 1984 amended by PL 100–48, 1 June 1987; PL 103–160, 30 November 1993; PL 104–106, 10 February 1996; PL 105–85, 18 November 1997; and PL 113–360.

*b.* The PH is awarded in the name of the President of the United States and, in accordance with 10 USC 1131, effective 19 May 1998, is limited to members of the Armed Forces of the United States who, while serving under competent authority in any capacity with one of the U.S. Armed Services after 5 April 1917, have been wounded, were killed, or who have died or may hereafter die of wounds received under any of the following circumstances:

(1) In any action against an enemy of the United States.

(2) In any action with an opposing armed force of a foreign country in which the Armed Forces of the United States are or have been engaged.

(3) While serving with friendly foreign forces engaged in an armed conflict against an opposing armed force in which the United States is not a belligerent party.

(4) As the result of an act of any such enemy of opposing Armed Forces.

(5) As the result of an act of any hostile foreign force.

(6) After 28 March 1973, as a result of an international terrorist attack against the United States or a foreign nation friendly to the United States, recognized as such an attack by the SECARMY, or jointly by the Secretaries of the separate armed Services concerned if persons from more than one Service are wounded in the attack.

(7) After 28 March 1973, as a result of military operations while serving outside the territory of the United States as part of a peacekeeping force.

(8) Servicemembers who are killed or wounded in action by friendly fire. In accordance with 10 USC 1129 for award of the PH, the SECARMY will treat a Servicemember of the Armed Forces described in paragraph 2–8b(8)(a), in the same manner as a Servicemember who is killed or wounded in action as the result of an act of an enemy of the United States.

*(a)* A Servicemember described in this subsection is one who is killed or wounded in action by weapon fire while directly engaged in armed conflict, other than as the result of an act of an enemy of the United States, unless (in the case of a wound) the wound is the result of willful misconduct of the Servicemember.

*(b)* This section applies to Servicemembers of the Armed Forces who are killed or wounded on or after 7 December 1941. In the case of a Servicemember killed or wounded, as described in paragraph 2–8b, on or after 7 December 1941 and before 30 November 1993, the SECARMY will award the PH under provisions of paragraph 2–8a, in each case which is known to the Secretary before such date or for which an application is made to the Secretary in such manner as the Secretary requires.

(9) A former POW who was wounded before 25 April 1962 while held as a POW (or while being taken captive), will be treated in the same manner as a former POW who is wounded on or after that date while held as a POW (in accordance with Section 521 of PL 104–106).

(10) Pursuant to 10 USC 1129a, as amended by the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Section 571, the award of the PH for Servicemembers killed or wounded in attacks by foreign terrorist organizations, the SECARMY will treat a Servicemember of the Armed Forces who is killed or wounded as a result of an international terrorist attack against the United States as stated in 2–8b(6).

*(a)* A member described in this subparagraph is a member on active duty who was killed or wounded in an attack by a foreign terrorist organization in circumstances where the death or wound is the result of an attack targeted on the Servicemember due to such Servicemember's status as a member of the Armed Forces, unless the death or wound is the result of the Servicemember's willful misconduct.

*(b)* An attack by an individual or entity will be considered to be an attack by a foreign terrorist organization if—

*1.* The individual or entity was in communication with the foreign terrorist organization before the attack; and

*2.* The attack was inspired or motivated by the foreign terrorist organization.

*(c)* The term "foreign terrorist organization" is provided in the glossary.

*(d)* The provisions outlined in paragraph 2–8b(10) are retroactive to 11 September 2001.

*c.* While clearly an individual decoration, the PH differs from all other decorations in that an individual is not "recommended" for the decoration; rather, he or she is entitled to it upon meeting specific criteria.

*d.* A PH is authorized for the first wound suffered under conditions indicated above; for each subsequent award an oak leaf cluster will be awarded to be worn on the medal or ribbon. No more than one award will be made for more than one wound or injury received at the same instant or from the same missile, force, explosion, or agent.

*e.* A wound is defined as an injury to any part of the body from an outside force or agent sustained under one or more of the conditions listed above. A physical lesion is not required. However, the wound for which the award is made must have required treatment, not merely examination, by a medical officer. Additionally, treatment of the wound will be documented in the Servicemember's medical and/or health record. Award of the PH may be made for wounds treated by a medical professional other than a medical officer provided a medical officer includes a statement in the

000211

Servicemember's medical record that the extent of the wounds was such that they would have required treatment by a medical officer if one had been available to treat them.

*f.* When contemplating an award of this decoration, the key issue that commanders must take into consideration is the degree to which the enemy caused the injury. The fact that the proposed recipient was participating in direct or indirect combat operations is a necessary prerequisite, but is not sole justification for award.

*g.* Examples of enemy-related injuries which clearly justify award of the PH are as follows:

(1) Injury caused by enemy bullet, shrapnel, or other projectile created by enemy action.

(2) Injury caused by enemy-placed trap or mine.

(3) Injury caused by enemy-released chemical, biological, or nuclear agent.

(4) Injury caused by vehicle or aircraft accident resulting from enemy fire.

(5) Concussion injuries caused as a result of enemy-generated explosions.

(6) Mild traumatic brain injury or concussion severe enough to cause either loss of consciousness or restriction from full duty due to persistent signs, symptoms, or clinical finding, or impaired brain function for a period greater than 48 hours from the time of the concussive incident.

*h.* Examples of injuries or wounds which clearly do not justify award of the PH are as follows:

(1) Frostbite (excluding severe frostbite requiring hospitalization from 7 December 1941 to 22 August 1951).

(2) Trench foot or immersion foot.

(3) Heat stroke.

(4) Food poisoning not caused by enemy agents.

(5) Chemical, biological, or nuclear agents not released by the enemy.

(6) Battle fatigue.

(7) Disease not directly caused by enemy agents.

(8) Accidents, to include explosive, aircraft, vehicular, and other accidental wounding not related to or caused by enemy action.

(9) Self-inflicted wounds, except when in the heat of battle and not involving gross negligence.

(10) Post traumatic stress disorders.

(11) Airborne (for example, parachute/jump) injuries not caused by enemy action.

(12) Hearing loss and tinnitus (for example: ringing in the ears).

(13) Mild traumatic brain injury or concussions that do not either result in loss of consciousness or restriction from full duty for a period greater than 48 hours due to persistent signs, symptoms, or physical finding of impaired brain function.

(14) Abrasions and lacerations (unless of a severity to be incapacitating).

(15) Bruises (unless caused by direct impact of the enemy weapon and severe enough to require treatment by a medical officer)

(16) Soft tissue injuries (for example, ligament, tendon or muscle strains, sprains, and so forth).

(17) First degree burns.

*i.* It is not intended that such a strict interpretation of the requirement for the wound or injury to be caused by direct result of hostile action be taken that it would preclude the award being made to deserving personnel. Commanders must also take into consideration the circumstances surrounding an injury, even if it appears to meet the criteria. Note the following examples:

(1) In a case such as an individual injured while making a parachute landing from an aircraft that had been brought down by enemy fire; or, an individual injured as a result of a vehicle accident caused by enemy fire, the decision will be made in favor of the individual and the award will be made.

(2) Individuals injured as a result of their own negligence (for example, driving or walking through an unauthorized area known to have been mined or placed off limits or searching for or picking up unexploded munitions as war souvenirs) will not be awarded the PH as they clearly were not injured as a result of enemy action, but rather by their own negligence.

*j.* During wartime the senior Army commander (SAC) in the combat theater may award the PH as approval authority when delegated by the SECARMY or the ASA (M&RA). The SECARMY or the ASA (M&RA) may authorize further delegation of approval or disapproval authority. The NPRC awards the PH to any member of the Army who, during World War I, was awarded a Meritorious Service Citation Certificate signed by the Commander in Chief, American Expeditionary Forces, or who was authorized to wear wound chevrons, upon written application. Approval authority for the PH for Army personnel wounded or killed as the result of an international terrorist attack or as the result of an attack by a foreign terrorist organization is the SECARMY. Authority to approve or disapprove recommendations for the award for Servicemembers who did not receive a PH while serving in a unit with wartime awards approval authority is the Commander, HRC and may be further delegated, in writing, no lower than the Branch Chief, ADB. Although a Servicemember may be deployed, award of the PH for injuries incurred in a previous deployment must be processed through the Servicemember's current chain of command to the Commander, HRC for approval. The first general officer in the chain of command of the Servicemember recommended for award of the PH

000212

for injuries received during a previous deployment may disapprove the recommendation. The following types of requests for award of the PH will be forwarded to the Commander, HRC:

(1) Any member of the Army who was awarded the PH for meritorious achievement or service, as opposed to wounds received in action, between 7 December 1941 and 22 September 1943, may apply for award of an appropriate decoration instead of the PH.

(2) Any member of the Army who believes that they are eligible for the PH but, through unusual circumstances no award was made, may submit an application through the member's chain of command to Commander, HRC (AHRC–PDP–A). If the requestor has separated from the military, the application may be mailed directly to the Commander, HRC (AHRC–PDP–A). The application will include the following documentation pertaining to the wound and inflicting force:

(a) DA Form 4187 (Personnel Action).

(b) Chain of command endorsement (through the first general officer in the Soldier's current chain of command for currently serving members).

(c) Deployment orders.

(d) DA Form 4037 (Officer Record Brief)/enlisted records brief (ERB)/DA Form 2–1 (Personnel Qualification Record).

(e) One-page narrative describing the qualifying incident and the conditions under which the member was injured or wounded.

(f) Statements from at least two individuals, other than the proposed recipient, who were personally present, observed the incident, and have direct knowledge of the event. Alternatively, other official documentation may be used to corroborate the narrative.

(g) Casualty report.

(h) SF 600 (Medical Record - Chronological Record of Medical Care).

(i) DD Form 214 (Certificate of Release or Discharge from Active Duty) (if applicable).

k. Each approved award of the PH must exhibit all of the following factors: wound, injury, or death must have been the result of circumstances described in paragraph 2–8b; the wound or injury must have required treatment, not merely examination, by a medical officer. Additionally, treatment of the wound will be documented in the Servicemember's medical and/or health record. Award of the PH may be made for wounds treated by a medical professional other than a medical officer provided a medical officer includes a statement in the Servicemember's medical record that the extent of the wounds were such that they would have required treatment by a medical officer if one had been available to treat them.

l. When recommending and considering award of the PH for a mild traumatic brain injury or concussion, the chain of command will ensure the criteria in paragraph 2–8 is met, and that both diagnostic and treatment factors are present and documented in the Soldier's medical record by a medical officer.

(1) The following nonexclusive list provides examples of signs, symptoms, or medical conditions documented by a medical officer or medical professional that meet the standard for award of the PH:

(a) Diagnosis of concussion or mild traumatic brain injury.

(b) Any period of loss or a decreased level of consciousness.

(c) Any loss of memory for events immediately before or after the injury.

(d) Neurological deficits (weakness, loss of balance, change in vision, praxis (that is, difficulty with coordinating movements), headaches, nausea, difficulty with understanding or expressing words, sensitivity to light, and so forth) that may or may not be transient. Intracranial lesion (positive computerized axial tomography or magnetic resonance imaging scan).

(2) The following nonexclusive list provides examples of medical treatment for concussion that do meet the standard of treatment necessary for award of the PH:

(a) Referral to neurologist or neuropsychologist to treat the injury.

(b) Rehabilitation (such as occupational therapy, physical therapy, and so forth) to treat injury.

(c) Restriction from full duty for a period of greater than 48 hours due to persistent signs, symptoms, or physical finding of impaired brain function.

(3) Combat theater and unit command policies mandating rest periods or "down time" following incidents do not constitute qualifying treatment for concussion injuries. To qualify as medical treatment, this rest period must have been directed by a medical officer or medical professional for the individual after diagnosis of an injury as indicated in paragraphs 2–8l(1) and (2).

(4) The following nonexclusive list provides examples of medical treatment for concussion that do not meet the standard of treatment necessary for award of the PH:

(a) Limitation of duty following the incident (for example, limited duty, quarters, and so forth).

(b) Pain medication (such as acetaminophen, aspirin, ibuprofen, and so forth) to treat injury, such as headache.

m. Additional guidance.

(1) Award of the PH may be made for wounds (including mild traumatic brain injuries and concussive injuries)

treated by a medical professional other than a medical officer, provided a medical officer includes a statement in the Soldier's medical record that the extent of the wounds was such that they would have required treatment by a medical officer, if one had been available to treat them.

(2) A medical professional is defined as a civilian physician or a physician extender. Physician extenders include nurse practitioners, physician assistants, and other medical professionals qualified to provide independent treatment (to include SF medics). Medics (such as combat medics - MOS 68W) are not physician extenders.

(3) A medical officer is defined as a physician with officer rank. The following are medical officers:

*(a)* An officer of the medical corps of the Army.

*(b)* An officer of the medical corps of the USN.

*(c)* An officer in the USAF designated as a medical officer in accordance with 10 USC 101.

(4) All ACOM, ASCC, and DRU commanders will provide a monthly awards report of all concussion-related PH recommendations in spreadsheet format only to HRC. Subordinate commands will submit their PH roll-up to parent organizations to include the ARNG submitting to the National Guard Bureau. Those units that are not covered by the criteria mentioned above will forward their list directly to HRC, ADB. Sample spreadsheet format is located on the HRC ADB Web site at https://www.hrc.army.mil/site/active/tagd/awards/purpleheart/samplepurplehearthexcelsheet.xlsx.

*n.* Reconsideration authority.

(1) On request from the Soldier or veteran, Army officials will conduct a one-time reconsideration of requests for previously denied PHs relating to concussion injuries.

(2) Authority to reconsider PH recommendations for deployed Soldiers who were wounded on their current deployment rests with the first CG or deputy commanding general (DCG) in the chain of command in accordance with the applicable delegation of awards approval authority approved by the ASA (M&RA).

(3) Awards of the PH for injuries incurred in a previous deployment must be processed through the Soldier's current chain of command to the Commander, HRC. Additionally, requests that are not processed in the combat theater must be processed through the current chain of command to the Commander, HRC.

(4) The first general officer (BG/O–7) in the chain of command of the Soldier recommended for award of the PH for injuries received during a previous deployment may disapprove the recommendation.

(5) Commanders, unit adjutants (S1s), staff personnel officers and command surgeons, will employ a joint effort to ensure this clarified guidance is consistently and uniformly applied within their units.

*o.* The following rules apply for processing award of the PH:

(1) The statutory time limits pertaining to award of military decorations does not apply to the PH. The PH may be awarded at any time after submission of documented proof that criteria have been met.

(2) Approved awards of the PH require the publication of POs (see AR 600–8–105) citing each recipient. A DA Form 4980–10 (Purple Heart Medal Certificate) will include the following information: recipient's name and grade, date wounded in action, and date certificate is signed. All PH Medal Certificates will bear the signature and signature block of the SECARMY on the right side. During wartime, the signature and signature block of the commander authorized to award the PH will be on the left side. All other PHs awarded will bear the signature and signature block of The Adjutant General of the Army.

(3) Each approved award of the PH must exhibit all of the following factors:

*(a)* Wound, injury, or death must have been the result of enemy or hostile act, international terrorist attack, or friendly fire (as defined in para 2–8*b*(8)).

*(b)* The wound or injury must have required treatment by medical officials.

*(c)* The records of medical treatment must have been made a matter of official Army records as described in paragraph 2–8*m*.

(4) Recommendations for award of the PH based on alleged international terrorist attacks must be accompanied by a written evaluation from the ACOM, ASCC, or DRU security and intelligence staff officer indicating that international terrorist activity was involved. Should any enclosures be classified, the prescribed security measures will be followed. This requirement is in addition to the other eligibility criteria. HRC, ADB will confirm the international terrorist report with the DCS, G–2 prior to forwarding the PH recommendations to the SECARMY for final decision.

*p.* The Defense of Freedom Medal, established on 4 October 2001, is the civilian equivalent to the PH awarded to U.S. military personnel. Refer to AR 672–20 for criteria and requirements for the Defense of Freedom Medal.

000214

**Table 2–1**
**Steps for processing award of the Purple Heart**

| Step | Who | Required action |
|------|-----|-----------------|
| 1 | Soldier | Wounded or killed as a result of an action outlined in paragraph 2–8*b*. |
| 2 | Recommender | Completes top section of DA Form 4187, places address of the approval authority in the "TO" box, places address of intermediate commander in the "THRU" box, and places parent unit address in the "FROM" box. |
| 3 | Recommender | Completes section I of DA Form 4187. Checks "OTHER" box in section III, adds "Award of the PH," and enters date. |
| 4 | Recommender | In section IV, DA Form 4187 (Remarks) enters an explanation of sequences of events, medical treatment facility, and disposition of the awardee. |
| 5 | Recommender | Attaches substantiating documents and presents the packet to the company commander, officer in charge, or supervisor. |
| 6 | Company commander/officer in charge/supervisor | Verifies all data on the DA Form 4187 and the enclosures. Completes missing data. |
| 7 | Company commander/officer in charge/supervisor | Submits complete certified packet to intermediate commander. |
| 8 | Intermediate commander | Verifies, as necessary, and endorses action to approval authority. |
| 9 | Approval authority (as outlined in para 2–8*k*) | Makes final decision on command endorsement of award of the PH (recommends approval or disapproval). |
| 10 | Approval authority | Notifies recommender or recommending commander of the final decision. Issues PH award certificate and orders along with the medal set. |
| 11 | Approval authority | Distributes awards approval or disapproval documents into the Army Military Human Resource Record (AMHRR) as outlined in AR 600–8–104. Submits an electronic military personnel office (eMILPO) or personnel transaction. |
| 12 | Unit | Arranges and conducts presentation ceremony consistent with commander's requirements. |

## Section III
## Department of Defense Service Medals and Ribbons

### 2–9. Prisoner of War Medal

*a.* The criteria for award of the POW Medal is codified in 10 USC 1128. It is authorized for any person who, while serving in any capacity with the U.S. Armed Forces, was taken prisoner and held captive after 5 April 1917.

*b.* The POW Medal is to be issued only to those U.S. military personnel and other personnel granted creditable U.S. military service, who were taken prisoner and held captive—

(1) While engaged in an action against an enemy of the United States.

(2) While engaged in military operations involving conflict with an opposing foreign force.

(3) While serving with friendly forces engaged in an armed conflict against an opposing armed force in which the United States is not a belligerent party.

*c.* The POW Medal may be awarded to any person who, while serving in any capacity with the U.S. Armed Forces, who was held captive under circumstances not covered by paragraph 2–9*b* but which the SECARMY finds were comparable to those circumstances under which persons have generally been held captive by enemy armed forces during periods of armed conflict. Award of the POW Medal under comparable conditions provisions is the exception and not the rule. Authority to award the POW Medal under this provision may not be delegated below the SECARMY.

*d.* U.S. and foreign civilians who have been credited with U.S. military service which encompasses the period of captivity are also eligible for the medal. The Secretary of Defense authorized on 27 January 1990, the POW Medal for the Philippine Commonwealth Army and recognized Guerrilla Unit Veterans who were held captive between 7 December 1941 and 26 September 1945.

*e.* The POW Medal will be issued only to foreign military and civilian personnel who, while serving in any capacity with the U.S. Armed Forces, meet the eligibility criteria contained in paragraph 2–9*b*. While no minimum time period of captivity exists as eligibility criteria for the POW Medal, the Services should determine each case on its own merit.

*f.* For purposes of this medal, past armed conflicts are defined as World War I, World War II, Korean War, Vietnam Conflict, Grenada, Panama, Southwest Asia (SWA) Conflict, Somalia, and Iraq. Hostages of terrorists and persons detained by governments with which the United States is not engaged actively in armed conflict are not eligible for the medal. For the procedures to award the POW Medal for Afghanistan and Iraq see paragraph 2–9*l*.

*g.* Any person convicted of misconduct or a criminal charge by a U.S. military tribunal, or who receives a less than honorable discharge based upon actions while a POW, or whose conduct was not in accord with the Code of Conduct,

000215

RTTUZYUW RUEWMCS0000 3432016-UUUU--RUCRNAV.
ZNR UUUUU

R 092016Z DEC 11
FM SECNAV WASHINGTON DC

TO ALNAV
INFO SECNAV WASHINGTON DC
CNO WASHINGTON DC
CMC WASHINGTON DC
BT

ALNAV 079/11

MSGID/GENADMIN/SECNAV WASHINGTON DC/-/DEC//

SUBJ/DEPARTMENT OF THE NAVY STANDARDS FOR AWARD OF THE PURPLE HEART (PH)//

REF/A/DOC/POTUS/25APR1962//
REF/B/DOC/DOD/23NOV2010//
REF/C/DOC/SECNAV/22AUG2006//
REF/D/LTR/USDPR/25APR2011//
REF/E/LTR/DEPSECDEF/21JUN2010//
REF/F/GENADMIN/CMC/151135ZAPR11//
REF/G/DOC/CMC/01MAR2011//
REF/H/DOC/CNP/22AUG2002//
NARR/REFERENCE A IS EXECUTIVE ORDER 11016 AUTHORIZING THE PH.  REFERENCE B IS
DEPARTMENT OF DEFENSE MANUAL (DODM) 1348.33 VOLUME 3, MILITARY DECORATIONS AND
AWARDS.  REFERENCE C IS SECNAVINST 1650.1H NAVY AND MARINE CORPS AWARDS MANUAL.
REFERENCE D IS THE MEMORANDUM FROM UNDER SECRETARY OF DEFENSE PERSONNEL AND
READINESS TO MILITARY DEPARTMENT SECRETARIES REGARDING PH FOR MILD TRAUMATIC
BRAIN INJURY (MTBI). REFERENCE E IS DIRECTIVE-TYPE MEMORANDUM 09-033, POLICY
GUIDANCE FOR MANAGEMENT OF CONCUSSION/MILD TRAUMATIC BRAIN INJURY IN THE
DEPLOYED SETTING UPDATED W CH2 ON 22 FEB 2011.  REFERENCE F IS MARADMIN 245-
11.  REFERENCE G IS MCO 3040.4 MARINE CORPS CASUALTY ASSISTANCE PROGRAM.  REFERENCE
H IS MILPERSMAN 1770 CASUALTIES AND SURVIVOR BENEFITS.//

POC/J. NIERLE/CIV/NDBDM/TEL: 202-685-6397/-//

RMKS/1. THIS ALL NAVY (ALNAV) MESSAGE CLARIFIES AND UPDATES THE DEPARTMENT OF THE
NAVY (DON) POLICY FOR AWARD OF THE PH.  THE PURPOSE OF THIS ALNAV IS TO ENHANCE
CONSISTENCY ACROSS THE DON BY PROVIDING AMPLIFYING GUIDANCE TO ASSIST PH
AWARDING AUTHORITIES IN APPLYING THE PH CRITERIA TO INDIVIDUAL CASES. DETAILED
GUIDANCE IS INCLUDED CONCERNING AWARD OF THE PH FOR MTBI.  THE BASIC ELIGIBILITY
AND CRITERIA CONTAINED IN REFERENCES A THROUGH C REMAIN UNCHANGED, AND THIS
MESSAGE DOES NOT CANCEL PREVIOUS GUIDANCE PUBLISHED WITHIN DON CONCERNING
AWARD OF THE PH FOR WOUNDS OTHER THAN MTBI.  THE STANDARDS SET FORTH IN THIS
ALNAV ARE EFFECTIVE IMMEDIATELY AND MAY BE RETROACTIVELY APPLIED FOR CERTAIN
INSTANCES OF MTBI SUFFERED ON OR AFTER SEPTEMBER 11, 2001.  RETROACTIVE AWARDS ARE
ADDRESSED FURTHER IN PARAGRAPH 11 OF THIS ALNAV.

2. PER REFERENCE C, THE PH MAY ONLY BE AWARDED WITHIN THE DON IF BOTH OF THE
FOLLOWING CRITERIA ARE MET:

A.  THE WOUND WAS THE DIRECT OR INDIRECT RESULT OF ENEMY ACTION, AND

B.  THE WOUND REQUIRED TREATMENT BY A MEDICAL OFFICER AT THE TIME OF INJURY.

3.  CLARIFICATION OF CRITERION 2A:  WOUND WAS THE DIRECT OR INDIRECT RESULT OF ENEMY ACTION.

A. WOUND IS DEFINED BY REFERENCE B AS AN INJURY TO ANY PART OF THE BODY FROM AN OUTSIDE FORCE OR AGENT.

B. WOUNDS/INJURIES ARE THE DIRECT RESULT OF ENEMY ACTION WHEN THE PHYSICAL EFFECTS OF AN ENEMY WEAPON ON THE SERVICE MEMBER ARE THE IMMEDIATE CAUSE OF THE WOUND/INJURY (E.G., BEING STRUCK BY PROJECTILES, FRAGMENTATION, OR BLAST FROM AN ENEMY WEAPON OR IMPROVISED EXPLOSIVE DEVICE).

C. WOUNDS/INJURIES ARE THE INDIRECT RESULT OF ENEMY ACTION WHEN THE SERVICE MEMBER IS INJURED BY A SUBSEQUENT ACTION THAT IS SOLELY THE RESULT OF THE EFFECTS OF THE ENEMY WEAPON (E.G., AIRCRAFT IS DAMAGED BY ENEMY MISSILE, FORCING THE CREW TO EJECT AND THEY SUSTAIN INJURIES AS A RESULT OF THE EJECTION).

D. ACCIDENTAL INJURIES.  INJURIES SUFFERED DUE TO AN ACCIDENT THAT IS NEITHER DIRECTLY NOR INDIRECTLY CAUSED BY THE EFFECTS OF ENEMY WEAPONS DO NOT MEET THE ELIGIBILITY REQUIREMENTS FOR THE PH, EVEN IF THE ACCIDENT OCCURS IN A COMBAT ZONE OR DURING AN ENGAGEMENT WITH THE ENEMY.  EXAMPLES OF SUCH ACCIDENTAL WOUNDS/INJURIES THAT WOULD NOT QUALIFY FOR THE PH ARE:

(1) INJURIES SUFFERED DUE TO A MOTOR VEHICLE MISHAP THAT IS NOT CAUSED BY IMPACT OF AN ENEMY WEAPON TO THE VEHICLE OR DRIVER, EVEN IF THE MISHAP IS DUE TO EVASIVE MANEUVERS.

(2) INJURIES SUSTAINED WHILE SEEKING SHELTER, ESCAPING, OR EVADING.

E. WOUNDS CAUSED BY UNKNOWN/UNIDENTIFIED INDIVIDUALS.  WITHIN A COMBAT ZONE, THE WOUNDED SERVICE MEMBER'S COMMANDING OFFICER SHALL MAKE THE DETERMINATION AS TO WHETHER WEAPONS FIRED BY UNKNOWN INDIVIDUALS WERE LIKELY FIRED BY ENEMY COMBATANTS.  IF SO, WOUNDS RECEIVED FROM THOSE WEAPONS MAY QUALIFY FOR THE PH.  OUTSIDE OF A COMBAT ZONE, WOUNDS/INJURIES CAUSED BY THE ACTIONS OF UNKNOWN INDIVIDUALS, OR AS A RESULT OF CRIMINAL ACTIONS, SHALL NOT BE ASSUMED TO BE CAUSED BY ENEMY ACTION, AND SHALL NOT QUALIFY FOR AWARD OF THE PH UNLESS THE WOUND IS DETERMINED TO BE THE RESULT OF AN INTERNATIONAL TERRORIST ATTACK.

4. CLARIFICATION OF CRITERION 2B: WOUND REQUIRED TREATMENT BY A MEDICAL OFFICER AT THE TIME OF INJURY.

A. PER REFERENCE B A MEDICAL OFFICER IS A PHYSICIAN WITH OFFICER RANK.

B. MEDICAL OFFICERS ARE DISTINCT FROM CIVILIAN PHYSICIANS AND PHYSICIAN EXTENDERS, A TERM THAT APPLIES TO OTHER PERSONNEL WHO MAY BE INVOLVED IN THE TREATMENT OF WOUNDS, SUCH AS PHYSICIANS ASSISTANTS (PA), NURSE PRACTITIONERS (NP), INDEPENDENT DUTY CORPSMEN (IDC), SPECIAL FORCES MEDICS, AND SPECIAL AMPHIBIOUS RECONNAISSANCE CORPSMEN (SARC).  BASIC CORPSMEN AND BASIC MEDICS ARE NOT CLASSIFIED AS PHYSICIAN EXTENDERS.

C. SOMETIMES A WOUND THAT WOULD NORMALLY REQUIRE TREATMENT BY A MEDICAL OFFICER MUST BE TREATED BY A PHYSICIAN EXTENDER OR CORPSMEN/MEDIC AT A FORWARD DEPLOYED LOCATION BECAUSE EVACUATION TO A FACILITY WITH A MEDICAL OFFICER IS NOT TACTICALLY FEASIBLE.  IN SUCH SITUATIONS, A PH MAY BE APPROVED IF THE COMMANDER WITH PH APPROVAL AUTHORITY DETERMINES THAT THE WOUND/INJURY WOULD HAVE NORMALLY REQUIRED TREATMENT BY A MEDICAL OFFICER HAD ONE BEEN AVAILABLE.  THIS DETERMINATION CAN BE MADE BASED UPON EITHER THE INFORMATION PROVIDED IN PERSONNEL CASUALTY REPORTS OR REVIEW OF THE WOUNDED SERVICE MEMBER'S MEDICAL RECORD BY THE SUPERVISING MEDICAL OFFICER, OR THE ADVICE OF THE COMMANDER'S STAFF SURGEON AFTER REVIEW OF THE MEDICAL DOCUMENTATION AVAILABLE. IN ANY CASE, PER REFERENCE B THERE MUST BE A WRITTEN STATEMENT FROM A MEDICAL OFFICER SUBSTANTIATING THE DETERMINATION.

D. EVALUATION BY A MEDICAL OFFICER SOLELY TO DETERMINE THE EXTENT OF AN INJURY DOES NOT MEET THE PH THRESHOLD OF REQUIRING TREATMENT BY A MEDICAL OFFICER IF THE INJURY IS DETERMINED TO BE AT A LEVEL THAT COULD HAVE BEEN ADEQUATELY TREATED BY A PHYSICIAN EXTENDER OR A CORPSMAN/MEDIC. LIKEWISE, A DECISION BY A MEDICAL OFFICER TO TREAT A MINOR WOUND THAT A CORPSMAN COULD HAVE ADEQUATELY TREATED DOES NOT MEAN THE WOUND REQUIRED TREATMENT BY A MEDICAL OFFICER.  AWARD OF THE PH WOULD NOT BE AUTHORIZED IN EITHER OF THESE TWO EXAMPLE SITUATIONS.

5. EXAMPLES OF WOUNDS THAT NORMALLY QUALIFY FOR AWARD OF THE PH.  IN CASES IN WHICH THE REQUIREMENTS IN PARAGRAPHS 2A AND 2B HAVE BEEN MET, THE FOLLOWING TYPES OF WOUNDS/INJURIES ARE CONSISTENT WITH DEPARTMENT OF THE NAVY STANDARDS FOR AWARD OF THE PH:

A. FRAGMENTATION WOUNDS.

B. LACERATIONS.

C. FRACTURES.

D. GUNSHOT WOUNDS.

E. PERFORATED EARDRUM.

F. MODERATE OR SEVERE/PENETRATING TRAUMATIC BRAIN INJURIES (TBI) (SEE ADDITIONAL INFORMATION IN PARAGRAPH 9 BELOW).

G. MTBI/CONCUSSIONS SEVERE ENOUGH TO CAUSE EITHER LOSS OF CONSCIOUSNESS (LOC) OR RESTRICTION FROM FULL DUTY DUE TO PERSISTENT SIGNS, SYMPTOMS, OR CLINICAL FINDINGS OF IMPAIRED BRAIN FUNCTION FOR A PERIOD GREATER THAN 48 HOURS FROM THE TIME OF THE CONCUSSIVE INCIDENT.

(1) THE 48 HOUR PERIOD DOES NOT INCLUDE ASSIGNMENT TO ADMINISTRATIVE LIGHT DUTY SOLELY FOR A MANDATORY PERIOD OF OBSERVATION/SCREENING AS REQUIRED BY MEDICAL PROTOCOLS (SUCH AS REFERENCE E) FOR EVALUATION OF INDIVIDUALS WHO MAY HAVE HAD SOME BLAST EXPOSURE, REGARDLESS OF THE PRESENCE OF ANY SIGNS, SYMPTOMS, AND FINDINGS OF IMPAIRED BRAIN FUNCTION.

(2) THE MEDICAL OFFICER DISPOSITION OF MTBI/CONCUSSION WITH EITHER LOC OR MORE THAN 48 HOUR RESTRICTION FROM RETURN TO FULL DUTY MUST BE MADE WITHIN SEVEN (7) DAYS OF THE CONCUSSIVE EVENT.

(3) SEE ADDITIONAL INFORMATION ON TBI IN PARAGRAPH 9 BELOW.

H. SMOKE INHALATION SEVERE ENOUGH TO CAUSE 1ST TO 3RD DEGREE BURNS TO THE RESPIRATORY TRACT.

I. CORNEAL ABRASIONS.

J. EFFECTS OF CHEMICAL, BIOLOGICAL, OR NUCLEAR WEAPONS (TO INCLUDE CHLORINE GAS USED BY THE ENEMY IN CONJUNCTION WITH AN IED).

K. 2ND AND 3RD DEGREE BURNS.

6. FRIENDLY FIRE INCIDENTS.  NAVY AND MARINE CORPS PERSONNEL RECEIVING THE ABOVE WOUNDS/INJURIES AS A RESULT OF FRIENDLY FIRE ARE ONLY ELIGIBLE FOR THE PH IF THEY WERE ACTIVELY ENGAGING THE ENEMY AT THE TIME OF THE INJURY.

7. MULTIPLE WOUNDS.  IF MULTIPLE WOUNDS ARE RECEIVED AT THE SAME INSTANT OR FROM THE SAME MISSILE, FORCE, EXPLOSION, OR AGENT, ONLY ONE AWARD OF THE PH WILL BE MADE.

8. NON-QUALIFYING WOUNDS.  THE FOLLOWING ARE EXAMPLES OF WOUNDS/INJURIES THAT ARE NOT CONSISTENT WITH DEPARTMENT OF THE NAVY STANDARDS FOR AWARD OF THE PH:

A. COLD AND HEAT RELATED INJURIES (E.G., FROSTBITE AND HEATSTROKE).

B. HEARING LOSS AND TINNITUS (I.E., RINGING IN THE EARS).

C. MTBI/CONCUSSIONS THAT DO NOT EITHER RESULT IN LOC OR RESTRICTION FROM FULL DUTY FOR A PERIOD GREATER THAN 48 HOURS DUE TO PERSISTENT SIGNS, SYMPTOMS, OR CLINICAL FINDINGS OF IMPAIRED BRAIN FUNCTION.

D. POST TRAUMATIC STRESS DISORDER (PTSD) OR COMBAT STRESS INJURIES.

E. DISEASE (UNLESS THE RESULT OF AN ENEMY OR TERRORIST NUCLEAR, BIOLOGICAL, OR CHEMICAL ATTACK).

F. ABRASIONS (UNLESS OF A SEVERITY TO BE INCAPACITATING).

G. BRUISES (UNLESS CAUSED BY DIRECT IMPACT OF ENEMY WEAPON AND SEVERE ENOUGH TO REQUIRE TREATMENT BY A MEDICAL OFFICER).

H. FIRST DEGREE BURNS.

I. SOFT TISSUE INJURIES (E.G., LIGAMENT/TENDON/MUSCLE STRAINS OR SPRAINS).

J. ANY WOUNDS/INJURIES RECEIVED AS A RESULT OF FRIENDLY FIRE WHEN THE INDIVIDUAL WAS NOT ENGAGING THE ENEMY AT THE TIME OF THE INJURY.

9. AWARD OF THE PH FOR TBI.

A. TBI ARE CLASSIFIED INTO THREE CATEGORIES BASED ON SEVERITY OF THE INJURY.  IN DECREASING LEVELS OF SEVERITY, THESE CATEGORIES ARE: SEVERE/PENETRATING TBI; MODERATE TBI; AND MTBI.

B. MTBI AND CONCUSSION ARE FREQUENTLY USED INTERCHANGEABLY.  MTBI IS A MEDICAL TERM DEFINING THE PHYSICAL INJURY TO THE BRAIN FROM A BLOW OR BLAST. CONCUSSION IS THE LAYMAN TERM DESCRIBING IMPAIRMENT TO BRAIN FUNCTION (E.G., ALTERATION OF CONSCIOUSNESS, LOSS OF CONSCIOUSNESS (LOC), OR POST-TRAUMATIC AMNESIA) RESULTING FROM THE INJURY.

C.  DIAGNOSIS OF EITHER A SEVERE/PENETRATING TBI OR A MODERATE TBI NECESSARILY REQUIRES TREATMENT BY A MEDICAL OFFICER AND, THEREFORE, WILL QUALIFY FOR THE PH IF THE WOUND WAS THE DIRECT OR INDIRECT RESULT OF ENEMY ACTION.

D.  HOWEVER, THERE ARE VARYING SEVERITY LEVELS OF MTBI/CONCUSSIONS WHICH CAN PRODUCE SIGNS, SYMPTOMS, AND CLINICAL FINDINGS OF IMPAIRED BRAIN FUNCTION, RANGING FROM "SEEING STARS" AND DISORIENTATION TO POST-CONCUSSIVE AMNESIA AND LOC. ONLY THE MORE SEVERE INSTANCES OF MTBI/CONCUSSION WILL REQUIRE TREATMENT BY A MEDICAL OFFICER, AND THEREFORE QUALIFY FOR AWARD OF THE PH.  EVEN THOUGH A MEDICAL OFFICER MAY BE REQUIRED TO EVALUATE THE SAILOR/MARINE BASED ON DISPLAYED SIGNS, SYMPTOMS, OR FINDINGS OF IMPAIRED BRAIN FUNCTION, SUCH EVALUATION DOES NOT IN ITSELF MEAN THE WOUND REQUIRED TREATMENT BY A MEDICAL OFFICER.

E. RECENT RESEARCH INTO MTBI EFFECTS AND TREATMENT HAS LED TO A CLEARER UNDERSTANDING OF THE RELATIONSHIP BETWEEN THE SEVERITY OF AN MTBI AND THE TIME REQUIRED FOR BRAIN TISSUE TO RECOVER AND RETURN TO ITS NORMAL STATE. ALTHOUGH THERE IS CURRENTLY NO METHOD TO DIRECTLY MEASURE THE ACTUAL SEVERITY OF A MILD TRAUMATIC BRAIN INJURY, THE DURATION OF THE SIGNS, SYMPTOMS, OR CLINICAL FINDINGS OF IMPAIRED BRAIN FUNCTION SERVE AS A PROXY FOR ESTIMATING MTBI SEVERITY, AND THUS WHETHER THE MTBI MEETS THE PH THRESHOLD OF NECESSITATING TREATMENT BY A MEDICAL OFFICER. THE MOST MILD FORMS OF MTBI MAY RESULT IN LESS SEVERE COGNITIVE IMPAIRMENT LASTING ONLY MINUTES OR HOURS, WITH NO LASTING DAMAGE TO BRAIN TISSUE OR IMPAIRED BRAIN FUNCTION.  IN THE MORE SEVERE CASES OF MTBI, THE LEVEL OF INJURY MAY RESULT IN IRREVERSIBLE DAMAGE TO BRAIN TISSUE WITH LONG TERM IMPAIRMENTS OF BRAIN FUNCTION.  RESEARCH ALSO INDICATES THAT MANY SERVICE MEMBERS SUFFERING MTBI/CONCUSSIONS WITHOUT ANY LOC CAN HAVE SIGNS, SYMPTOMS, OR CLINICAL FINDINGS OF IMPAIRED BRAIN FUNCTION THAT LAST SIGNIFICANTLY LONGER THAN THOSE RESULTING FROM AN MTBI/CONCUSSION WITH LOC.  FOR THESE REASONS, MILITARY NEUROLOGISTS NOW CONSIDER THE DURATION OF BRAIN FUNCTION IMPAIRMENT TO BE A MORE ACCURATE MEASUREMENT OF THE DEGREE OF BRAIN INJURY THAN WHETHER OR NOT A LOC OCCURRED.

F. FOR THE REASONS CITED IN THE PRECEDING PARAGRAPHS, DEPT OF THE NAVY HAS UPDATED AND REVISED ITS STANDARDS FOR AWARDING THE PH FOR MTBI. SPECIFICALLY, AN MTBI/CONCUSSION WILL BE CONSIDERED SEVERE ENOUGH TO HAVE REQUIRED TREATMENT BY A MEDICAL OFFICER, AND THEREFORE MAY QUALIFY FOR THE PH:

(1) WHEN THE SERVICE MEMBER SUFFERS A LOC OF ANY DURATION AS A RESULT OF A DIAGNOSED MTBI/CONCUSSION, OR

(2) WHEN THE PERSISTENT SIGNS, SYMPTOMS, OR FINDINGS OF FUNCTIONAL IMPAIRMENT FROM A DIAGNOSED MTBI/CONCUSSION RESULT IN A MEDICAL OFFICER DISPOSITION OF "NOT FIT FOR FULL DUTY" FOR A PERIOD GREATER THAN 48 HOURS.  THIS 48 HOUR RESTRICTION FROM RETURN TO FULL DUTY DOES NOT INCLUDE ASSIGNMENT TO ADMINISTRATIVE LIGHT DUTY BY A MEDICAL PROVIDER OR MEDICAL OFFICER IN THE ABSENCE OF PERSISTENT SYMPTOMS OF IMPAIRMENT FOR THE SOLE REASON OF COMPLIANCE WITH ADMINISTRATIVE SCREENING PROTOCOLS FOR CONCUSSIVE EVENTS.

G. SIGNS, SYMPTOMS, OR FINDINGS OF BRAIN FUNCTION IMPAIRMENT MANIFEST WITHIN THE

000220

FIRST FEW DAYS AFTER SUFFERING AN MTBI/CONCUSSION.  THEREFORE, A MEDICAL OFFICER OR CIVILIAN PHYSICIAN DIAGNOSIS WEEKS OR MONTHS AFTER A CONCUSSIVE INCIDENT, CITING ADDITIONAL OR MORE SEVERE SYMPTOMS OF BRAIN IMPAIRMENT THAN WERE DIAGNOSED DURING THE INITIAL SEVEN (7) DAY PERIOD FOLLOWING THE CONCUSSIVE EVENT, WILL NOT WARRANT AWARD OF THE PH.  THIS RESTRICTION IS NECESSARY TO ENSURE THE PH IS NOT AWARDED FOR SYMPTOMS OF POST TRAUMATIC STRESS DISORDER (PTSD) THAT ARE SIMILAR TO THOSE OF MTBI/CONCUSSION, OR FOR A SUBSEQUENT CONCUSSIVE INJURY THAT WAS NOT THE RESULT OF ENEMY ACTION.

10. PERSONNEL CASUALTY REPORT (PCR).

    A. COMMANDERS AT ALL LEVELS SHALL ENSURE THAT PCRS ARE SUBMITTED IAW REFERENCE F AND G (MARINE CORPS) AND REFERENCE H (NAVY), AND CONTAIN SUFFICIENT INFORMATION FOR THE PH APPROVING AUTHORITY TO DETERMINE IF THE WOUND/INJURY MET THE REQUIREMENTS FOR THE PH CONTAINED IN PARAGRAPH 2 ABOVE.

    B. THE COMMANDING OFFICER OF THE WOUNDED/INJURED SERVICE MEMBER MUST ENSURE THE PCR CONTAINS VERIFICATION FROM A MEDICAL OFFICER THAT THE WOUND/INJURY FOR WHICH THE MEMBER WAS TREATED REQUIRED TREATMENT BY A MEDICAL OFFICER, OR WOULD HAVE REQUIRED TREATMENT BY A MEDICAL OFFICER IF ONE HAD BEEN AVAILABLE PER PARAGRAPH 4 OF THIS ALNAV.  A SUFFICIENTLY DETAILED DESCRIPTION OF THE WOUND/INJURY AND TREATMENT REQUIRED MUST BE PROVIDED TO SUPPORT THE OPINION OF THE MEDICAL OFFICER.  PHRASES SUCH AS "TREATED BY COMPETENT MEDICAL AUTHORITY" DO NOT PROVIDE SUFFICIENT INFORMATION TO MAKE A DETERMINATION AS TO WHETHER THE WOUND/INJURY WAS OF A LEVEL OF SEVERITY TO REQUIRE TREATMENT BY A MEDICAL OFFICER, REGARDLESS OF WHETHER A MEDICAL OFFICER WAS AVAILABLE TO PROVIDE THE TREATMENT.

11. RETROACTIVE AWARDS OF THE PH. THE UPDATED STANDARDS FOR AWARD OF THE PH FOR MTBI LISTED IN PARAGRAPHS 4.G AND 9.G OF THIS ALNAV ARE RETROACTIVE TO SEPTEMBER 11, 2001. PERSONNEL WHO SUFFERED A DIAGNOSED MTBI ON OR AFTER SEPTEMBER 11, 2001 THAT WAS THE DIRECT OR INDIRECT RESULT OF ENEMY ACTION, BUT WHO WERE NOT AWARDED THE PH FOR THAT MTBI (OR OTHER WOUND SUFFERED DURING THE SAME ACTION), MAY REQUEST RECONSIDERATION.   REFERENCE F CONTAINS DETAILED RECONSIDERATION PROCEDURES FOR MARINES, AND FOR NAVY PERSONNEL WHO WERE SERVING IN MARINE CORPS UNITS AT THE TIME OF THE WOUND/INJURY. ALL OTHER NAVY PERSONNEL MAY REQUEST RECONSIDERATION BY CONTACTING THE OFFICE OF THE CHIEF OF NAVAL OPERATIONS (CODE DNS-35), 2000 NAVY PENTAGON, WASHINGTON, DC  20350-2000.

12. THIS ALNAV IS APPLICABLE TO THE TOTAL FORCE NAVY AND MARINE CORPS.

13. RELEASED BY RAY MABUS, SECRETARY OF THE NAVY.//
BT
#0000
NNN