## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LYNN BROWN**, <br><br> Plaintiff, <br><br> v. <br><br> **CHRISTINE WORMUTH,** Secretary of the Army,[1] *et al.*, <br><br> Defendants. | Case No. 17-cv-2112 (CRC) |

## <u>MEMORANDUM OPINION</u>

For the past six years, the family of the late Army Staff Sergeant Joshua Berry ("SSG Berry") has been trying to convince the Army to posthumously award him the Purple Heart. SSG Berry was stationed at the Fort Hood Army base on November 5, 2009, when Major Nidal Hasan opened fire on fellow servicemembers and civilian law enforcement. SSG Berry leaped over a desk to take cover from multiple rounds fired at a set of metal doors behind which he was standing and, in doing so, dislocated his left shoulder. He was released from active duty following the attack and later died by suicide.

Following SSG Berry's death, the late Howard M. Berry, SSG Berry's father and the original plaintiff in the action, petitioned the U.S. Army Decorations Board to award his son the Purple Heart. The Decorations Board denied the request in March 2015. Mr. Berry sought review of the denial and in April 2016, the U.S. Army Board for the Correction of Military Records ("ABCMR") recommended that SSG Berry be given the award. This conclusion was reversed six months later, however, when the Deputy Assistant Secretary of the Army ("DASA")

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary of the Army Christine E. Wormuth is automatically substituted for former Secretary Ryan D. McCarthy.

rejected the ABCMR's recommendation.  Mr. Berry then filed suit in this Court challenging the

DASA's decision under the Administrative Procedure Act ("APA").

      This Court has now twice remanded the DASA's determination to the Army for further

explanation of its decision to deny SSG Berry the Purple Heart.  The DASA has thus provided a

third explanation of that determination, which is currently before the Court on the parties' cross-

motions for summary judgment.  The Army seeks affirmance of the DASA's decision not to

award SSG Berry the Purple Heart, while SSG Berry's aunt, Lynn Brown, who was substituted

as the plaintiff in this case following Howard Berry's death in June 2020, asks the Court to set

the decision aside as arbitrary and capricious.  For the following reasons, the Court sides with the

Army.

## I.   Background

      SSG Berry was assigned to Fort Hood following a year-long deployment to Afghanistan.

Am. Compl. ¶ 7.  On November 5, 2009, Nidal Malik Hasan, an Army medical officer,

perpetrated a mass shooting at Fort Hood that killed thirteen people and injured thirty others.

Berry v. Esper, 322 F. Supp. 3d 88, 89 (D.D.C. 2018) (Cooper, J.).  On the day of the shooting,

SSG Berry was in a briefing room inside Building 42004, one of the buildings Hasan targeted.

Id.; Administrative Record ("A.R.") 223.[2]  Next door was Building 42003, where most of the

casualties occurred.  Am. Compl. ¶ 8.  SSG Berry heard shots fired outside of the room he was in

and told the others in the room to take cover on the floor.  Berry, 322 F. Supp. 3d at 89.  He then

---

[2] There has been uncertainty throughout this case as to whether SSG Berry's building was
targeted in the attack.  See Tr. Hr'g Mot. at 8:03–11:12 (summarizing conflicting evidence).  But
as explained in more detail below, the DASA clarified in his May 2020 decision "that the greater
weight of the evidence indicates that *the assailant did fire shots at the building*" that SSG Berry
occupied.  A.R. 223 (emphasis added).

heard bullets strike the room's exterior metal doors and, in leaping over a desk to take cover, dislocated his shoulder.  Id.

On April 25, 2011, an Army medical board found SSG Berry unfit for continued military service due to post-traumatic stress disorder, the shoulder injury received in the Fort Hood shooting, and degenerative arthritis of the spine.  See A.R. 12–14.  He was released from active duty the following month and placed on the temporary disability retired list.  Id. at 89.  On February 13, 2013, SSG Berry died by suicide.  Id. at 82.

Following the Army's announcement that servicemembers injured in the Fort Hood shooting were eligible for the Purple Heart, SSG Berry's father, the late Howard Berry, applied for the award to be given to his son posthumously.  Am. Compl. ¶ 32; A.R. 6, 76.[3]  The U.S. Army Decorations Board unanimously denied award of the Purple Heart on the grounds that SSG Berry's injury was not the result of enemy action and he was not in direct contact with the shooter.  A.R. 6.  By letter, the Decorations Board notified Mr. Berry of its decision and invited him to "apply to the [ABCMR] if he felt the decision was unjust or unfair."  Id.

Taking the Decorations Board up on this offer, Mr. Berry filed an application with the ABCMR on December 6, 2015, requesting that SSG Berry's military records be corrected to reflect a posthumous award of the Purple Heart.  Am. Compl. ¶ 37.  The ABCMR recommended by a two-to-one vote that SSG Berry be given the award.  A.R. 10.  The ABCMR found that SSG

---

[3] Army regulations provide that a servicemember is entitled to the Purple Heart if wounded as the result of a terrorist attack committed by a foreign terrorist organization. 10 U.S.C. § 1129a; Army Reg. 600-8-22, ¶ 2-8(*b*)(1).  In 2015, Congress clarified that servicemembers injured during attacks inspired by foreign terrorist organizations and committed by individuals who were in communication with such organizations could qualify for the award. See 10 U.S.C. § 1129a(b); Army Reg. 600-8-22, ¶ 2-8*(b)*(10)(b).  In turn, the Secretary of the Army determined that servicemembers injured or killed in the Fort Hood shooting were eligible for the Purple Heart if they met the other regulatory criteria.  See A.R. 78–79.

Berry's shoulder injury constituted a qualifying "wound" from the attack.  Id. at 9; see Army Reg. 600-8-22, ¶ 2.8(*e*) (2006).  The ABCMR then considered "the degree to which the enemy (i.e., the terrorist) caused his injury," A.R. 9, which is a factor in the Army's Purple Heart regulations, Army Reg. 600-8-22, ¶ 2.8(*f*) (2006).  Additionally, the ABCMR evaluated examples cited in the regulations as injuries that are Purple Heart-eligible, including those incurred "while making a parachute landing from an aircraft that had been brought down by enemy fire" or "as a result of a vehicle accident caused by enemy fire."  A.R. 9.  The ABCMR differentiated SSG Berry's injury from these examples on the ground that SSG Berry was injured as the result of his own decision to take cover rather than enemy force.  Id.  Yet, the ABCMR was persuaded that SSG Berry would not have sought cover if not for the shots fired outside of Building 42004.  Id.  The ABCMR thus recommended that the Army award SSG Berry the Purple Heart.  Id. at 10.

A few months later, the then-DASA, Honorable Francine C. Blackmon, exercised her authority to override the ABCMR's recommendation.  Id. at 2.  The DASA supported her decision with a single-paragraph letter, stating:

> I have reviewed the findings, conclusions, and Board member recommendations. I find there is not sufficient evidence to grant relief.  Therefore, under the authority of [10 U.S.C. § 1552], I have determined that the facts do not support a conclusion that [SSG Berry's] injury met the criteria for a Purple Heart.

Id.

In October 2017, Mr. Berry responded with this action for review of the DASA's decision under the APA.  See Compl.  The following August, this Court ruled in Berry's favor. The Court reasoned that it was unable to "meaningfully evaluate" the Army's denial of the Purple Heart to SSG Berry because the DASA "summarily disagreed" with the eight-page ABCMR recommendation without any obvious support in the Administrative Record.  Berry,

322 F. Supp. 3d at 91.  The Court therefore remanded the case to the Army to explain why the DASA's "cursory denial" of the Purple Heart was not arbitrary and capricious.  Id.  The Court specifically requested clarification on the causation of SSG Berry's injury and the evidence relied upon by the DASA in reversing the ABCMR.  Id. at 92.

On December 19, 2018, the DASA issued a new letter again finding that SSG Berry did not qualify for the Purple Heart.  A.R. 199–201.  Expanding on the limited reasoning of her first letter, the DASA explained that even severe injuries "sustained in a kinetic combat environment" do not qualify for the Purple Heart if not directly caused by the enemy.  Id. at 200.  Although the DASA concluded that SSG Berry would not have dove for cover and injured his shoulder if it weren't for the assailant's gunfire, she nonetheless concluded that there was an insufficient causal connection between Hasan's actions and SSG Berry's injuries to qualify him for the Purple Heart.  Id.  Additionally, the DASA noted that the regulations specifically exclude "self-inflicted wounds" from consideration for the Award, with an exception for those wounds sustained in the "heat of battle."  Id. at 200–01 (citing Army Reg., 600-8-2 ¶ 2.8(h)(9)).  But the DASA found that the exception did not apply to SSG Berry, who, in her view, had not entered the heat of battle when he was injured.  Id. at 201.  The DASA further noted that the phrase "'self-inflicted wounds' implies an accidental discharge of one's weapon."  Id. (quoting Army Reg. 600-8-2 ¶ 2.8(h)(9)).  Accordingly, the DASA concluded that because "SSG Berry's injury was not the result of an outside force or agent," there was "an insufficient causal connection" between the injury and the attack to make him eligible for the Purple Heart.  Id.

Mr. Berry then amended his complaint to request judicial review of the DASA's December 19, 2018, decision.  See Am. Compl.  Following a second round of summary judgment briefing, the Court held a hearing on the cross-motions.  Ruling from the bench, the

Court again sided with Mr. Berry.  The Court reasoned that the DASA's latest decision did not attempt to reconcile the competing evidence on whether SSG Berry heard gunshots outside the building and dove for cover, or whether he took cover because the perpetrator shot directly at the building.  Tr. Mot. Hr'g at 10:01–10:07.  Additionally, the Court could not adequately discern the reason for the DASA's conclusions regarding causation and the inapplicability of the heat-of-battle exception.  Id. at 11:20–11:23.  The Court thus once again remanded the case to the Army for further explanation of its decision.  See Feb. 20, 2020, Min. Order.

On May 12, 2020, the Honorable Alexander Conyers (who had since succeeded Ms. Blackmon as DASA) issued a five-page letter to "address the Court's concerns" by clarifying the factual findings and more fully explaining the decision to deny SSG Berry the Purple Heart. A.R. 222–26 (hereinafter, the "May 2020 Letter").  That letter is the basis for today's decision, so the Court will describe it in some detail.

DASA Conyers began by noting that he "fully concur[red] with [his] predecessor's decision, and, with some exceptions, fully incorporate[d] . . . her reasons and rationale" into his decision.  Id. at 222.  He proceeded to make the following factual findings: (1) that the greater weight of the evidence indicates that the assailant used a handgun to fire shots at the building in which SSG Berry was located, id. at 223; (2) that the assailant did not enter the room SSG Berry was occupying, id.; (3) that SSG Berry was "[s]heltering in place" at the time of the shooting, id. at 225; (4) that "[t]he causal force of [SSG Berry's] injury was far more attributable to [his] decision to dive to the floor than it was to the assailant's gunfire[,]" id. at 224; and (5) that his injury did not fall into the "heat of battle" self-inflicted wound exception, id. at 225.

The Army subsequently moved for summary judgment, arguing that DASA Conyers' May 2020 denial was adequately explained and supported by the record, and therefore must be

upheld under the APA.  Ms. Brown, who had since succeeded the late Mr. Berry as plaintiff,  <u>see</u>

Consent Mot. to Sub. Party, opposed the motion and cross-moved for summary judgment,

arguing that the May 2020 letter is, like the ones before it, arbitrary and capricious.  Rather than

remand the decision to the Army for a third time, Brown asks that the Court order the Army to

award SSG Berry the Purple Heart.  Pl. Mot. for Summ. J. at 14 (hereinafter, "Pl. MSJ").  The

parties' motions are ripe for the Court's resolution.

## II.   Legal Standards

### A.  <u>Summary Judgment Under the Administrative Procedure Act</u>

Summary judgment is the proper stage for determining whether, as a matter of law, an

agency action is supported by the administrative record and otherwise complies with the APA.

<u>Richards v. Immigr. & Naturalization Serv.</u>, 554 F.2d 1173, 1177 (D.C. Cir. 1977).  Under the

APA, 5 U.S.C. § 706(2)(A), "[a] court shall set aside the [agency's] action, findings, and

conclusions regarding the correction of military records if they are arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law."  <u>Haselwander v. McHugh</u>, 774 F.3d 990,

996 (D.C. Cir. 2014) (cleaned up).  The court must determine whether the agency "examine[d]

the relevant data and articulate[d] a satisfactory explanation for its action including a rational

connection between the facts found and the choice made."  <u>Motor Vehicle Mfrs. Ass'n of U.S.,</u>

<u>Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).  If the agency action is

reasonable, the court must accept it.  <u>Roberts v. Harvey</u>, 441 F. Supp. 2d 111, 118 (D.D.C.

2006).

### B.  <u>Military Deference</u>

The Secretary of the Army, acting through the ABCMR, may correct any military record

of the Secretary's department when the Secretary considers it necessary to correct an error or

remove an injustice.  10 U.S.C. § 1552(a)(1).  An application for correction of a military record

is considered by a panel of at least three ABCMR members. 32 C.F.R. § 581.3(e)(3)(i).  The

ABCMR members are charged with the responsibility to "[r]eview all applications that are

properly before them to determine the existence of error or injustice." Id. § 581.3(b)(4)(i).  The

ABCMR will recommend a correction if it determines that "the preponderance of the evidence

shows that an error or injustice exists" in an applicant's records.  Id. § 581.3(e)(3)(iii)(A).

The Secretary has "broad discretion in administering the correction of military records."

Haselwander, 774 F.3d at 996.  Still, the action must be supported by "reasoned

decisionmaking."  Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 374 (1998)

(cleaned up).

As a military review board, the ABCMR is entitled to even greater deference than

civilian administrative agencies.  Coe v. McHugh, 968 F. Supp. 2d 237, 240 (D.D.C. 2013)

(citing Calloway v. Brownlee, 366 F. Supp. 2d 43, 53 (D.D.C. 2005)).  Accordingly, courts

reviewing an ABCMR decision adhere to an "unusually deferential application of the arbitrary

and capricious standard." Kreis, 866 F.2d at 1514.  The reviewing court's role is limited to

determining whether "the decision making process was deficient, not whether [the] decision was

correct." Dickinson v. Sec'y of Def., 68 F.3d 1396, 1405–06 (D.C. Cir. 1995) (quoting Kreis,

866 F.2d at 1511).  Courts must uphold the ABCMR's decisions so long as they "minimally

contain[] a rational connection between the facts found and the choice made."  Frizelle v. Slater,

111 F.3d 172, 176 (D.C. Cir. 1997) (cleaned up).  "[A] party seeking review of a board decision

bears the burden of overcoming the strong, but rebuttable, presumption that administrators of the

military, like other public officers, discharge their duties correctly, lawfully and in good faith.'"

Roberts v. Geren, 530 F. Supp. 2d 24, 33 (D.D.C. 2007) (quoting Frizelle, 111 F.3d at 177).

III.  **Analysis**

Ms. Brown claims that DASA Conyers' May 12, 2020, decision was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law because it is unsupported by the administrative record.  In so doing, Brown renews her prior arguments that the Army distorted the applicable legal standards and failed to consider relevant evidence regarding the cause of SSG Berry's injuries.  The Army disagrees, insisting that the DASA examined the relevant evidence and adequately explained his conclusion that the Purple Heart criteria were not satisfied.  Mindful of the heightened deference accorded to the Army's decision in this case, the Court's analysis proceeds in two parts.  *First*, the Court evaluates whether the factual findings made by DASA Conyers in the May 2020 letter have adequate support in the record.  *Second*, the Court considers whether the DASA provided a rational connection between those findings and his conclusion.

A.  Factual Findings

Courts reviewing agency determinations under the APA "adopt the agency's factual findings as conclusive if supported by substantial evidence."  Dillmon v. Nat'l Transp. Safety Bd., 588 F.3d 1085, 1089 (D.C. Cir. 2009); see also Kight v. United States, 850 F. Supp. 2d 165, 170 (D.D.C. 2012) (applying "substantial evidence" test to military decision).  The "substantial evidence" standard may be satisfied "even though a plausible alternative interpretation of the evidence would support a contrary view."  Dillmon, 588 F.3d at 1089.  In determining whether this standard has been met, the court is not to function as a "super correction board" by reweighing the evidence.  Kight, 850 F. Supp. 2d at 170 (quoting Charette v. Walker, 996 F. Supp. 43, 50 (D.D.C. 1998)).

DASA Conyers made several factual findings, only one of which Brown contests.  Before turning to that dispute, the Court will briefly recount the relevant findings upon which both parties agree.  First, the DASA found that Hasan fired shots at the building in which SSG Berry was located.  A.R. 223.  Relatedly, the DASA found that while some of the shots hit the building, Hasan never entered the room that SSG Berry occupied.  Id.  Additionally, the DASA found that SSG Berry's "shoulder separation occurred when [he] deliberately (and quite advisedly) dove to the floor after apprehending the assailant's actions near his building."  Id. at 224.  These findings are both undisputed and supported by extensive evidence in the record.  See Pl. MSJ at 2–3; see, e.g., A.R. 5–7, 12, 40–43, 50, 52–53, 55, 58, 72.

Turning to the lone disputed finding, DASA Conyers concluded that SSG Berry was "[s]heltering in place" when he was wounded.  A.R. 225.  Brown contests this characterization, arguing that the evidence "shows that [SSG Berry] dove for cover when Hasan fired three rounds at the doors behind which [he] was standing, attempting to kill him."  Pl. MSJ at 11.[4]  The Army does not dispute the fact that Hasan was shooting at SSG Berry's location when he dove for cover.  And, as Brown points out, id. at 10, the DASA acknowledged that SSG Berry's decision to "shelter[] in place" rather than engage the shooter was "the smart thing, and probably what he was trained to do[.]"  A.R. 225.  The wisdom of SSG Berry's judgment, however, is irrelevant to

---

[4] Relatedly, Brown argues that DASA Conyers failed to consider evidence indicating that Hasan shot at SSG Berry specifically and that "[s]hooting at a building is obviously different from shooting at and attempting [to] kill someone inside a building."  See Pl. MSJ at 7.  Brown asserts that "[t]he latter is far more purposeful, direct and potentially deadly."  Id. at 7–8.  Brown fails to explain how this distinction might affect DASA Conyers' analysis.  As explained in more detail below, DASA Conyers concluded that SSG Berry's shoulder injury was attributable to his decision to dive to the floor to avoid Hasan's gunfire and that the heat-of-battle exception did not apply to an injury sustained while "temporarily seek[ing] cover."  A.R. 223.  Neither conclusion is implicated by the purported distinction between shooting at SSG Berry's location versus shooting at SSG Berry.  Indeed, the government does not contest that Hasan "did shoot at" SSG Berry.  Def. MSJ at 3.

whether, as a factual matter, he was injured while sheltering in place.  Substantial and uncontroverted evidence shows that, rather than exit the building and engage with Hasan, SSG Berry dove for cover inside a building secured by metal doors and concrete walls.  See Am. Compl. ¶ 10; A.R. 5, 40–43, 52, 225.  Other than Brown's assertion that the DASA's characterization of that evidence is mistaken, the Court finds no reason to disturb the finding that SSG Berry was sheltering in place when he dislocated his shoulder.  The Court therefore credits this factual finding as well.

In sum, the Court is satisfied that the DASA's factual findings are supported by substantial evidence and adopts them as conclusive for the remainder of its analysis.

B.  Application

The Court next considers whether DASA Conyers' May 2020 letter "minimally contains a rational connection between the facts found and the choice made."  Frizelle, 111 F.3d at 176. According to Brown, the Army fails to clear this low bar because the DASA inadequately explained his determination regarding (1) the causation requirement, and (2) the heat-of-battle exception for self-inflicted wounds.  The Court addresses these issues in turn.

1.  Causation

A member of the Army is eligible for the Purple Heart if he or she was (1) wounded, injured, or killed in hostile action, terrorist attack, or friendly fire; (2) the wound or injury required medical treatment; and (3) "[t]he records of medical treatment . . . have been made a matter of official Army records."  Army Reg. 600-8-22, ¶¶ 2-8(c), 2-8(l)(3) (2006).  This case turns on the first factor: the degree to which the enemy or hostile force caused the wound.

In his May 2020 letter, DASA Conyers concluded that SSG Berry's injury was not sufficiently caused by a hostile force because the injury was "more attributable to [SSG Berry's]

decision to dive to the floor" than to the gunfire.  A.R. 224.  In reaching this conclusion, the DASA acknowledged that Hasan shot at the building in which SSG Berry was located and that the shooting prompted SSG Berry to dive for the floor.  Id. at 223–24.  Nonetheless, the DASA reasoned that the shoulder injury was *more* attributable to his decision to "deliberately (and quite advisedly) [dive] to the floor after apprehending the assailant's actions near his building" than to the shooting itself.  Id. at 224.  The DASA noted that the causation requirement *would* be satisfied for "wounds sustained from bullet fragments and material propelled by the fired bullets (e.g., glass, concrete, wood, or plaster fragments)."  Id.  Here, by contrast, the DASA reasoned that the injury "was not caused by a fired bullet or by one or more propelled fragments" but instead by SSG Berry's deliberate decision to dive for cover due to the shots fired.  Id.  The DASA thus concluded that SSG Berry is ineligible for the Purple Heart.

Brown contests this conclusion, arguing that Hasan "plainly caused SSG Berry's injury in any ordinary sense[.]" Pl. MSJ at 9–10.  But regardless of what Brown (or, for that matter, the Court) may believe about causation "in any ordinary sense," the Court's "inquiry focuses not on whether the Army was substantively correct," Coe, 968 F. Supp. 2d at 240 (cleaned up), but rather on whether the decision "minimally contains a rational connection between the facts found and the choice made," Frizelle, 111 F.3d at 176 (cleaned up).  Given that the DASA supplied such a connection here, the Court declines to opine on whether the conclusion was correct.

Relatedly, Brown argues that DASA Conyers failed to explain "why an injury sustained taking evasive action in response to direct enemy gunfire cannot be proximately caused by gunfire." Pl. MSJ at 8–9.  But the DASA's decision did, in fact, respond to this question.  He explained:

> One might assert that any injury connected to the assaultive actions of an enemy should qualify for the Purple Heart, including injuries resulting from evasive

> actions intended to avoid the enemy's assault. But Army and other DOD regulations specifically exclude injuries primarily attributable to a Soldier's own efforts to avoid enemy fire. For instance, the Army regulation excludes parachute jump injuries not caused by enemy action. The Navy Purple Heart regulation excludes "injuries sustained while seeking shelter, escaping, or evading." The Marine Corps regulation provides that injuries "on the battlefield that are not caused either directly or indirectly by the effects of an enemy weapon do not meet eligibility requirements for the award even if they occur during an engagement with the enemy (e.g., a vehicle moving to a new firing position overturns in a ditch or a Marine falls while running for cover from a sniper)."

A.R. 224 (cleaned up).  This explanation is based on a reasonable application of the relevant regulations to facts in the record.  As such, it survives arbitrary and capricious review.

Brown's arguments to the contrary are unavailing.  First, Brown contends that the DASA's decision is arbitrary and capricious because it improperly relied on Navy and Marine Corps regulations when interpreting the Army's causation requirement.  See Pl. MSJ at 12, 14. Granted, the DASA noted that the Navy deems evasive injuries ineligible for the award and the Marine Corps considers injuries eligible only if caused "by the effects of an enemy weapon[.]" A.R. 224 (cleaned up).  But the DASA did not erroneously construe these regulations to be binding on his determination as to SSG Berry.  In fact, the DASA expressly noted that these provisions were "*not controlling on [his] decision*," and merely "inform[ed]" the DASA that his causation finding was "not anomalous . . . to how the U.S. Armed Forces generally view and apply the Purple Heart criteria."  Id. (emphasis added).  The Army's decision to look to other services' regulations for guidance when interpreting its own regulations is well within its discretion.

Brown also takes issue with the DASA's reliance on the regulations' examples of non-qualifying injuries.  Again, the DASA reasoned that "Army and other DOD regulations specifically exclude injuries primarily attributable to a Soldier's own efforts to avoid enemy fire," including, for example, "the Army regulation exclud[ing] parachute jump injuries not

caused by enemy action." A.R. 224. According to Brown, the DASA improperly relied on "parachute/jump injuries not caused by enemy action" because "[p]arachute jump injuries are not subject to a blanket exclusion." Pl. MSJ at 11–12. But whether parachute jump injuries are subject to a blanket exclusion is beside the point. The DASA cited to the exclusion of parachute jumps "*not caused by enemy action*" to illustrate the point that not all injuries merely "connected to the assaultive actions of an enemy" qualify for the Purple Heart. A.R. 224 (emphasis added). This logic holds regardless of whether *all* injuries involving parachute jumps are excluded from receiving the award.[5]

### 2. Heat of battle

Among the examples of non-qualifying injuries listed in the Army's Purple Heart regulations are "[s]elf-inflicted wounds, except when in the heat of battle and not involving gross negligence." Army Reg. § 2-8(*h*)(8) (2006). Like his predecessor, DASA Conyers concluded that the heat-of-battle exception was inapplicable to SSG Berry's injuries. He explained:

> [T]he phrase 'self-inflicted wound' connotes an accidental discharge of one's own weapon. I therefore find that SSG Berry's wound does not meet this criterion. I also find that SSG Berry had not entered the heat of battle, despite my earlier finding that the assailant fired shots at the building; that some shots hit the building; and that SSG Berry apprehended that shots were fired at the building. Sheltering in place behind concrete and metal walls and doors does not, in my estimation, constitute engagement in battle. To the extent there was a "battle" it was either completely one-sided in that the assailant was unilaterally firing his handgun, or it involved the assailant engaging in a firefight with civilian law enforcement outside the building. In my assessment, SSG Berry had not yet engaged in that battle at the relevant time. Instead, being unarmed, he did the smart thing . . . temporarily seek cover and assist his teammates.

---

[5] Brown also argues that the lack of a blanket prohibition on parachute jump injuries suggests that "[i]t is the facts and circumstances" of the injury that matter when applying the regulations. Pl. MSJ at 12. This argument misses the mark because DASA Conyers' May 2020 letter did, in fact, provide an extensive survey of the facts and circumstances surrounding SSG Berry's injury before concluding that "the *circumstances of this case* do not match" the criteria for the Purple Heart. A.R. 225 (emphasis added).

A.R. 225.

Brown asks that the Court set aside this conclusion as contrary to Army Reg. 600-8-22, § 2-8(*i*), which provides: "It is not intended that such a strict interpretation of the requirement for the wound or injury to be caused by direct result of hostile action be taken that it would preclude the award being made to deserving personnel."  Pl. MSJ at 10.  The Army rejoins that § 2-8(*i*) merely underscores the Army's discretion to either award *or* deny the Purple Heart given the circumstances.  Def. Opp. to Pl. Cross-Mot. at 6–7.  The Army has the better of this argument. To be sure, the cited provision of § 2-8(*i*) cautions against draconian readings of the regulations that would deny the award to a servicemember that the Army finds deserving.  But the provision does not thereby compel the Army to award the Purple Heart to a servicemember it deems ineligible.  As the Army points out, immediately following the language cited by plaintiffs, § 2-8(*i*) continues: "Commanders must also take into consideration the circumstances surrounding an injury, *even if it appears to meet the criteria*."  Id. (emphasis added).  In other words, § 2-8(*i*) highlights the Army's discretionary authority to apply the regulations to the particular circumstances of any given injury.  DASA Conyers' May 2020 letter reflects a valid exercise of that authority.

## IV.  Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiff's Cross-Motion for Summary Judgment.  A separate Order shall accompany this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  August 31, 2021